FILED'09 DEC 15 15 37USDC-ORP

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

JERRY DAY,                          )       Civil No. 08-944-JE
                                    )
            Plaintiff,              )       FINDINGS AND
                                    )       RECOMMENDATION
      v.                            )
                                    )
COMMISSIONER of Social Security, )
                                    )
            Defendant.              )
_____)

      David B. Lowry
      9900 S.W. Greenburg Road
      Columbia Business Center, Suite 235
      Portland, OR 97223

            Attorney for Plaintiff

      Karin J. Immergut
      U.S. Attorney, District of Oregon
      Adrian L. Brown, Asst. U.S. Attorney
      1000 S.W. Third Avenue, Suite 600
      Portland, OR 97204-2902

            Attorneys for Defendant


FINDINGS AND RECOMMENDATION - 1

JELDERKS, Magistrate Judge:

Plaintiff Jerry Day brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Plaintiff seeks an Order remanding the action to the Social Security Administration (SSA) for an award of benefits. In the alternative, plaintiff seeks an order remanding the action for further proceedings.

For the reasons set out below, this action should be reversed and remanded to the agency for a determination that plaintiff is disabled, determination of the date of the onset of plaintiff's disability, and an award of benefits.

### Procedural Background

Plaintiff initially filed applications for DIB and SSI on April 5, 1996, alleging that he had been disabled since July 31, 1989, because of a degenerative back condition, instability in both knees, fibromyalgia, and left hip pain that he had experienced since he was injured in a motorcycle accident on June 27, 1985. After his applications were denied initially and on reconsideration, plaintiff timely requested a hearing before an administrative law judge (ALJ).

On June 18, 1997, ALJ Charles Evans conducted a hearing in The Dalles, Oregon. Plaintiff was represented by David Lowry, his current attorney, at that hearing. Plaintiff, four witnesses, and a Vocational Expert (VE) testified at the hearing. In a decision issued on November 26, 1997, the ALJ found that plaintiff was not disabled within the meaning of the

Social Security Act (the Act). Pursuant to plaintiff's request for reconsideration, the Appeals Counsel remanded the action for further proceedings.

A second hearing was held before Dan Hyatt, another ALJ, on February 6, 2001. No testimony was taken because the ALJ and plaintiff's counsel agreed that a psychodiagnostic examination performed by Jim Greenough, Ph.D., on August 7, 2000, did not appear to comply with the Appeals Counsel's instructions on remand. The ALJ decided to refer plaintiff for another examination.

The ALJ reconvened the hearing in Portland, Oregon, on November 8, 2001. Plaintiff and Scott Stripe, a VE, testified at that hearing. On March 19, 2002, ALJ Hyatt issued a decision finding that plaintiff was not disabled within the meaning of the Act. That decision became the final decision of the Commissioner two years later, on March 19, 2004, when the Appeals Council denied plaintiff's request for review.

On April 15, 2004, plaintiff brought an action in this court challenging the decision denying his applications for benefits. On November 30, 2004, while his action was pending in this court, plaintiff filed a subsequent claim for SSI benefits.

On July 22, 2005, pursuant to the stipulation of the parties, the court remanded the action to the agency for further proceedings. Pursuant to the court's order, the Appeals Council remanded the action to an ALJ with instructions that plaintiff be offered the opportunity for a new hearing, and the opportunity to submit additional evidence, testimony, and arguments. The order further required the ALJ, on remand, to reconsider and evaluate the severity and effects of all of plaintiff's impairments, "including, but not limited to fibromyalgia, irritable bowel syndrome, and somatization disorder. . . ." The ALJ was also directed to evaluate and address all of the reports and opinions provided by Dr. Greenough

FINDINGS AND RECOMMENDATION - 3

and Dr. Irvine.  Finally, the ALJ was directed to "consider and state the weight given to lay

witness testimony," to reassess plaintiff's residual functional capacity, to obtain further VE

testimony if necessary, and to take any further action necessary to complete the

administrative record . . . ."  The Appeals Council's remand order also instructed the ALJ to

consolidate plaintiff's SSI claim filed on November 30, 2004, with plaintiff's prior claims,

and to issue a new decision on the consolidated claims.

On September 18, 2006, Riley Atkins, a third ALJ, conducted a hearing, on remand,

in The Dalles, Oregon.  Plaintiff and Kay Wise, a VE testified at the hearing.

On December 18, 2006, ALJ Atkins issued a decision finding that plaintiff was not

disabled within the meaning of the Act.  That decision became the final decision of the

Commissioner on July 3, 2008, when the Appeals Council denied plaintiff's request for

review.  Plaintiff seeks review of that decision in this action.

### Factual Background

Plaintiff was born on February 28, 1953.  He was 36 years old on the alleged date of

the onset of disability in 1989, and was 41 years old when his insured status for the purposes

of DIB benefits expired in 1994.  Plaintiff was 53 years old when ALJ Atkins issued the most

recent decision denying his applications for benefits.

Plaintiff has a GED diploma, and was trained as a driver in the military.  He has

worked as a janitor, a cook and assistant manager for a fast food restaurant, a truck stop

cashier/fueler, material handler, roads repair worker, groundskeeper, parts counterman,

lube man, and an auto detailer.

FINDINGS AND RECOMMENDATION - 4

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

Step Three. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four. The Commissioner determines whether the claimant is able to perform work he or she has done in the past. A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the

Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

## Medical Record

On August 24, 1995, Robert Hill, a physical therapist at East Cascade Physical Therapy in The Dalles, Oregon, conducted a physical capacities evaluation of plaintiff.  Hill noted that plaintiff complained of "pain in multiple areas," including the posterior and anterior region of his torso, bilateral knee pain, and occasional headache pain.  Plaintiff told Hill that he had had numerous MRIs "which apparently showed some bulging discs in the lower back."  Plaintiff said that he had not worked regularly "for a lengthy period of time"

but had been able to take individuals to medical appointments as a volunteer "Care-A-Van

driver."

Hill concluded that plaintiff could sit for 30 to 60 minutes at a time, could stand for

30 minutes, and could walk for 30 minutes at a time.  He found that plaintiff could lift 40

pounds to his waist, 15 pounds to his shoulder, and 10 pounds overhead; could use hand

controls and foot controls without difficulty if the controls were close but experienced some

pain with repetitive activity; exhibited pain behavior when bending 40 degrees at the waist;

was unable to crouch without an assistive device; had some difficulty climbing a ladder; was

able to climb stairs without use of a handrail; and required support getting onto his knees and

to return to a standing position.  Hill opined that plaintiff was suited to perform sedentary to

light work, and might be suited to "clerical occupations, assembly or packaging and certain

driving occupations."  He noted that plaintiff seemed to be "willing to pursue vocation

training" and to pursue new "job avenues."

Dr. John Linster, one of plaintiff's leading physicians, diagnosed plaintiff with

fibromyalgia, somatization, depression, difficulty with sleep, and chronic pain as early as

August, 1995.  On January 6, 1996, Dr. Linster noted that plaintiff had a positive antinuclear

antibody (ANA) factor with a rheumatoid factor.  In a Medical Source Statement dated

October 2, 1996, Dr. Linster listed plaintiff's medical problems as including fibromyalgia,

herniated discs, bilateral knee pain, insomnia, muscle spasms, irritable bowel syndrome, and

high blood pressure.  Dr. Linster indicated that the objective evidence did not "reasonably

confirm that the severity of the alleged symptoms . . . arises from claimant's medical

condition."  He noted that plaintiff had told him that his symptoms prevented him from

working.  Dr. Linster opined that plaintiff was not disabled "based on objective medical

findings," but that, if his "subjective symptoms" were fully credited, those symptoms were disabling. He also opined that, because of his problems with stamina, pain, or fatigue, plaintiff "would require breaks of significantly greater duration or frequency" than are ordinarily provided by employers.

In assessing plaintiff's functional limitations, Dr. Linster opined that, during an eight-hour work day, plaintiff could stand or walk continuously for one hour and could stand or walk for a total of four hours, could lift or carry objects weighing up to 10 pounds up to 10 times during a one-hour period, could lift up to 25 pounds once during a half-hour period, could sit for two hours continuously, and for a total of four hours. He opined that, during an eight-hour work day, it was reasonable to expect that plaintiff would need to lie down and rest intermittently, would need to alternatively stand and sit to accommodate and relieve pain, and would need to elevate his legs intermittently. Dr. Linster indicated that plaintiff would have "substantial difficulty" with stamina, pain, or fatigue if he were working full time at light or sedentary levels of exertion, would need to work at a reduced pace, and would have difficulty concentrating or maintaining attention continuously for 2 hours. He also indicated that plaintiff would have difficulty performing manipulative or postural work functions, and would likely miss work more than 24 days per year because of his symptoms. Dr. Linster opined that plaintiff had been unable to work since October, 1995.

Dr. Linster completed a similar assessment on June 2, 1997. In this assessment, Dr. Linster omitted the diagnosis of knee pain included in his earlier assessment, and added chronic fatigue syndrome as a diagnosis. Dr. Linster again opined that plaintiff had been unable to work since October, 1995.

On August 29, 1996, Jim Greenough, Ph.D., a psychologist, performed a psychological evaluation of plaintiff. Dr. Greenough reported that, though plaintiff "was able to function quite effectively on testing," the testing had been "somewhat abbreviated because of the difficulty experienced in limiting the time the client spent on self description." Dr. Greenough found that plaintiff's reading ability was "above the high school level," and that there were "no indications of any particular weakness in academic or intellectual functioning." He concluded that plaintiff "appears to have at least average ability in these areas."

Dr. Greenough summarized his conclusions as follows:

> The client definitely experiences somatic symptoms which are somewhat disabling in nature, the exact extent of that disability having to be determined by medical findings. It is likely that, at least to some extent, these symptoms are psychosomatic in nature, but of course that does not necessarily reduce their impact on the client's ability to function. There did not appear to me to be any significant Axis I disorders other than the possible somatization disorder and an adjustment disorder with anxiety and depression, the latter part of which was not necessarily apparent at the time of the evaluation.

He diagnosed Adjustment Disorder with mixed emotional features, Somatization Disorder, and Personality Disorder NOS with obsessive/compulsive and dependent features, and rated plaintiffs Global Assessment of Functioning (GAF) at 58.[1] Dr. Greenough opined that plaintiff was "capable of undertaking a variety of training programs or job situations, at least in terms of intellectual and academic abilities." He did not observe any psychological factors that "in themselves would prevent him from working, though they might contribute to a physical disability."

---

[1]A GAF of 51-60 indicates "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders, American Psychiatric Association, 4th Edition (1994) (DSM IV), p. 32.

FINDINGS AND RECOMMENDATION - 9

On December 9, 1997, Dr. Linster apparently completed, but did not sign, a Fibromyalgia Questionnaire sent to him by plaintiff's counsel. In that document, Dr. Linster indicated that plaintiff met the American Rheumatological criteria for fibromyalgia. He listed plaintiff's symptoms as multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, swelling, irritable bowel syndrome, numbness and tingling, mild anxiety, depression, and temporomandibular joint dysfunction. Dr. Linster opined that emotional factors contributed to the severity of plaintiff's functional limitations, and indicated that plaintiff was not a malingerer.

On May 17, 1999, Brandon Irvine, M.D., another of plaintiff's treating physicians, included a note stating that "employability is not an option at this time" on a prescription form that he wrote for plaintiff. On a prescription form dated June 20, 2000, Dr. Irvine stated that plaintiff was "off work due [to] medical disability." Dr. Irvine's chart notes from June 5, 1998, through July 21, 2000, include references to treatment related to fibromyalgia.

At the request of Disability Determination Services (DDS), Dr. Greenough completed a second Psychodiagnostic Assessment on August 7, 2000. Dr. Greenough noted that he had earlier diagnosed plaintiff with an adjustment disorder, a somatization disorder, and a personality disorder with obsessive and dependent features. He indicated that his current impression was "much the same," except that he "would change the diagnosis from an adjustment disorder to a chronic depressive disorder associated with his pain and perception of physical disability." Dr. Greenough opined that plaintiff's "perception of himself as physically incapable of working is a major barrier." Though he noted that he could not "comment on the extent to which actual and identifiable physical limitations may restrict his ability to work," Dr. Greenough opined that "it is clear that he does experience severe chronic

FINDINGS AND RECOMMENDATION - 10

pain, and that his perception of himself as physically disabled is sufficient to lend a reality to that perception." He diagnosed a depressive disorder NOS, apparent somatization disorder, and personality disorder NOS with compulsive and dependent features. Dr. Greenough rated plaintiff's GAF at "about 48."[2]

At the request of plaintiff's counsel, on November 7, 2001, Dr. Irvine completed a "Diabetes Mellitus Residual Functional Capacity Questionnaire." Dr. Irvine listed plaintiff's diagnoses as fibromyalgia, hyperlipidemea, and hypoglycimea, and characterized his prognosis as "poor." He opined that plaintiff was incapable of performing even "low stress" jobs, would have difficulty with fatigue, stamina and pain, and would need to work at a reduced work pace. Dr. Irvine indicated that, during an eight-hour work day, plaintiff could sit for less than two hours and could sit/stand for less than two hours. He opined that working full time would likely worsen plaintiff's health problems, that plaintiff would sometimes need unscheduled breaks, and that plaintiff would likely miss work more than four times a month because of his impairments.

At the request of DDS, on March 21, 2001, Lawrence Lyon, Ph.D., a psychologist, performed a psychological examination of plaintiff. Dr. Lyon administered tests and performed a mental status exam. Dr. Lyon found that plaintiff functioned in the average range intellectually, and demonstrated strong verbal skills, including an ability to handle abstract concepts. He diagnosed Somatization Disorder, Rule Out Depressive Disorder NOS, Personality Disorder NOS, and assigned a GAF score of 60. Dr. Lyon opined that plaintiff had moderate limitations in his ability to interact appropriately with supervisors and ability to

---

[2]A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM IV, p. 32.

FINDINGS AND RECOMMENDATION - 11

respond appropriately to work pressures, and would likely develop physical complaints in response to stress.

On December 11, 2002, Richard Miller, a physical therapist at East Cascade Physical Therapy in the Dalles, Oregon, performed a physical capacities evaluation. Based upon his four-hour evaluation, Miller concluded that, during an eight-hour day, plaintiff could sit for up to 30 minutes at a time for up to a total of three hours; could stand for up to 15 minutes at a time for up to a total of one hour; and could walk for up to 15 minutes at a time for up to a total of one hour. He found that plaintiff could perform sedentary activities for up to four hours a day. Miller concluded that plaintiff was limited to "occasional" kneeling, bending, crouching, crawling, balancing, stair climbing, overhead reaching, forward reaching, repetitive grasping, and operation of foot and hand controls.

Sharon Eder, M.D., a non-examining State agency physician, completed a Physical Residual Functional Capacity Assessment on January 21, 2005. Dr. Eder listed plaintiff's diagnoses as including "DDD L Spine" and "OA Knee." She listed "DM, FM, HBP," and "PVD" as "alleged impairments." Dr. Eder opined that plaintiff could occasionally lift/carry 20 pounds and could frequently lift/carry 10 pounds; could stand and/or walk eight hours and sit six hours in an eight-hour work day; had no postural, manipulative, visual, communicative, or environmental limitations; and was limited in his "push and/or pull" capacity only by the limitations noted in his ability to lift and/or carry. Dr. Eder noted that plaintiff's file included no treating or examining source statements.

Dorothy Anderson, Ph.D., a non-examining State agency psychologist, completed a Psychiatric Review Technique form on January 21, 2005. Dr. Anderson listed "Depression NOS" as plaintiff's only medically determinable psychological disorder, and opined that this

affective disorder resulted in no restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; or episodes of decompensation.

## Hearing Testimony

1. Plaintiff's Testimony

Plaintiff testified as follows at the most recent hearing, which was held on September 18, 2006.

Plaintiff lives in a mobile home park in The Dalles, Oregon, where he lived with his grandmother until her death in 2002. He inherited his grandmother's mobile home, but was ultimately evicted because he could not afford the rent on the space. Plaintiff moved into the unoccupied trailer on the next space, which is owned by an acquaintance.

Plaintiff has not worked since 1994, when he was "permanently laid off" from his position as a janitor at the church he attended because he could not perform his duties without assistance. Since that time, the only income he has received was payment for taking care of his grandmother during a six-month period just before her death. Plaintiff and his caseworker were unable to identify any work plaintiff could perform, and his case was closed.

Since 2002, plaintiff's physical condition has worsened, and he has experienced increased pain. In 2002, plaintiff underwent arthroscopic surgery for torn cartilage in a knee. The surgery did not correct the problem. Plaintiff can stand for 20 to 30 minutes at a time, if he has taken enough Vicodin. Because of pain in his knees, hips, and back, plaintiff cannot stand without pain medication. Plaintiff can also sit for only 20 to 30 minutes at a time

without needing to stand, and is able to walk only about half of a block. He used to be able to walk for several blocks at a time, but his symptoms worsened during the previous year.

In addition to his other problems, plaintiff suffers from irritable bowel syndrome. He experiences both constipation and diarrhea, which requires him to use the bathroom about 30 minutes every day. He underwent a CT scan of his chest and abdomen and a gastroscopy in 2006, but has not been able to follow up because he lost his coverage under the Oregon Health Plan. Though he is eligible for VA care, he is not able to use VA medical services because he cannot afford the co-pays. Plaintiff has stopped using four of the eight medicines prescribed for him because he cannot afford them.

Plaintiff suffers from sleep apnea, which has disrupted his sleep for several years. He has a CPAP machine, but has been unable to use it because he does not have a bed to sleep in, and has to sleep in a sleeping bag or on a chair. At the time of the hearing, he had not used the machine for approximately six months. When he was able to use the machine, it helped, and allowed him to get about five hours of steady sleep each night.

Plaintiff takes cyclobenzaprine for severe muscle cramps. He has stopped taking Sonata and Naproxen, and has not consulted a physician about discontinuing their use.

Plaintiff spends most of his days "look[ing] at the four walls" in the small trailer that he occupies. He cannot stay up long enough to do many chores in the trailer. Plaintiff used to use his motorcycle to go grocery shopping, but can no longer operate the machine because of a leaky fuel valve. Before that, the motorcycle had been plaintiff's only transportation. When he received money from the VA, he used it to purchase a custom seat with a back rest that made riding the machine less painful. Plaintiff could usually ride for only about 20 minutes before needing to stop to stretch and relieve the pain in his hips and knees.

FINDINGS AND RECOMMENDATION - 14

Plaintiff is able to do laundry and fold his clothing. He can lift 20 pounds one time and 5 to 10 pounds repeatedly. Plaintiff has chronic pain in his hips, knees, back, hands, and feet, and transient pain in other parts of his body. The VA has diagnosed him with "Barringer" nodes on the knuckles of his hands. These are caused by arthritis, and plaintiff has difficulty gripping, and tends to drop objects. He has to be careful when cooking and handling hot pans, and has difficulty grasping grocery bags. Plaintiff has been told that he needs physical therapy, but is unable to exercise. When he walks he sometimes experiences dizzy spells, which lead to fainting.

2.  Vocational Expert's Testimony

The VE testified that plaintiff's part-time work caring for his grandmother was semi-skilled, medium level exertion, rated at an SVP level 3. Though plaintiff performed the work for approximately 12 years, he had been paid for only a four-month period.

The ALJ posed a hypothetical describing an individual capable of performing light level work, who was not required to stand or walk more than two hours during the workday, and who "would work best in a routine repetitive work environment with only occasional public contact." The VE testified that, with these limitations, an individual could not perform any of plaintiff's prior work.

The ALJ next asked the VE whether an individual with those limitations and plaintiff's age, education, and work experience could perform any other job. The VE testified that an individual with plaintiff's limitations could perform a "table worker" position, which was described as a light-duty, unskilled, sedentary position, performed primarily while sitting. The VE also identified an "assembler of printed products" position as within the

FINDINGS AND RECOMMENDATION - 15

prescribed limitations. She testified that the position is performed mostly while sitting, and allows for a sit/stand option. The position was described as unskilled, and light.

The ALJ then asked the VE the effect of adding to the hypothetical the assumption that the individual "would be absent from the workplace 4 to 8 hours per week at unpredictable times" because of chronic pain, fatigue, and discomfort. The VE responded that such an individual could not sustain employment, and would probably be placed on probation or terminated within the first 30-60 days.

Finally, the ALJ returned to his first hypothetical, and asked whether the addition of a requirement of working "in proximity to bathroom facilities" would alter the VE's conclusion as to the ability of the hypothetical individual to perform the table worker or assembler positions. The VE stated that such a requirement would not alter the ability to perform that work because State rules and regulations already required that bathrooms be provided within a reasonable distance.

In response to questioning by plaintiff's counsel, the VE testified that an individual whose regular production was 80% of that of an average worker would eventually be terminated.

## ALJ's Decision

The ALJ found that plaintiff had met the insured status requirements for eligibility for DIB through June 30, 1994, and that plaintiff had not engaged in substantial gainful activity since July 31, 1989, the date of the alleged onset of his disability.

At the second step, the ALJ found that plaintiff's degenerative disc disease, left knee osteoarthritis, somatoform disorder, and personality disorder were "severe" disorders within

FINDINGS AND RECOMMENDATION - 16

the meaning of the Act.  He found that plaintiff's fibromyalgia, irritable bowel syndrome, adjustment disorder, hypertension, diabetes, seizure disorder, and sleep disorder were not severe disorders.  In reaching the conclusion that fibromyalgia was not a severe disorder, the ALJ asserted that, though both Drs. Irvine and Linster had included a diagnosis of fibromyalgia in their assessments of plaintiff, neither had "reported findings in support of the diagnosis."  The ALJ asserted that plaintiff's "mild obstructive sleep apnea" had been adequately treated by a continuous positive airway pressure (CPAP) device.

At the third step of the disability analysis, the ALJ found that plaintiff did not have an impairment or impairments that met or equaled the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

At the fourth step, the ALJ found that plaintiff retained the functional capacity to perform "light exertion work" requiring occasional lifting of no more than 20 pounds at a time and frequent lifting of up to 10 pounds.  The ALJ further found that the range of light duty work that plaintiff could perform was reduced by non-exertional limitations.  He found that plaintiff could stand and walk no more than two hours during an eight-hour work day, was limited to simple, routine, repetitive work with occasional public contact, and required "proximity to restroom facilities."  Based upon this assessment, the ALJ concluded that plaintiff could not perform his past relevant work.

Based upon the testimony of the VE, at the fifth step of his disability analysis, the VE found that plaintiff could perform the requirements of  "table worker" and "assembler of printed products" positions.

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ erred in finding that his fibromyalgia and sleep apnea were not "severe" impairments, in rejecting the opinions of Drs. Lister and Irvine, in rejecting Dr. Greenough's opinions, in improperly rejecting lay witness testimony, in ignoring relevant

requirements in assessing plaintiff's residual functional capacity, and in finding plaintiff

capable of working as a table worker and an assembler of printer products.


1. Finding that fibromyalgia and sleep apnea were not "severe" impairments

  The "severity" analysis at step two of the disability determination "is a de minimis

screening device to dispose of groundless claims.  An impairment . . . can be found 'not

severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal

effect on an individual's ability to work.' "  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir.

1996) (citing Bowen v. Yuckert, 482 U.S. 137, 153-54 (1987); SSR 85-28; Yuckert v.

Bowen, 841 F.2d 303, 306 (9th Cir. 1988)).  In determining the severity of a claimant's

symptoms, the effectiveness of available therapies is a relevant factor.  20 C.F.R. §§

404.1529(c)(3), 416.929(c)(3).


a. Sleep Apnea

  The record establishes that plaintiff has been diagnosed with obstructive sleep apnea,

and for a time used a continuous positive airway pressure (CPAP) device for that problem.

At the most recent hearing before the ALJ, plaintiff testified that, though the CPAP machine

helped him sleep for about 5 hours at a time, he had not used the machine during the previous

six months because he did not have a bed to sleep in.

  In concluding that plaintiff's sleep apnea did not constitute an impairment that was

"severe" within the meaning of relevant regulations, the ALJ simply observed that his "mild

obstructive sleep apnea has been adequately treated with continuous positive airway pressure

(CPAP)."  To this simple declaration, the Commissioner now adds numerous arguments,

including the assertions that plaintiff has likely received payments from the VA that would allow him to purchase a bed, and that other "alternative treatments" for sleep apnea are available. The Commissioner asks the court to take judicial notice that there is no requirement that a patient be sleeping in a bed in order to use a CPAP machine.

Plaintiff correctly notes that, in reviewing the Agency's determination, this court must consider only those arguments actually asserted by the ALJ, and may not consider new arguments offered by the Commissioner. See, e.g., Ceguerra v. Secretary of HHS, 933 F.2d 735, 738 (9th Cir. 1991) (reviewing court must evaluate agency's decision only on grounds articulated by agency in making decision). However, without considering additional arguments now cited by the Commissioner, I conclude that the medical record contained substantial evidence supporting the ALJ's assertion that plaintiff's sleep apnea had been adequately treated with a CPAP. Though plaintiff complained to Dr. Cardosi about problems with his CPAP machine and traded his original unit for another, during visits in 2006, he never indicated that he was not using the machine. Instead, in his record of a visit in April, 2006, Dr. Cardosi noted that plaintiff had indicated that sleeping on a couch had made it more difficult to use the machine, but that he "definitely" noted improvement when using the CPAP. Dr. Cardosi assessed plaintiff's sleep apnea as "improved with CPAP" at a pressure which plaintiff was "tolerating well." Though plaintiff was advised to return if he was having any "particular difficulties or worsening symptoms," there is no evidence that he did so.

Under these circumstances, the ALJ's conclusion that plaintiff's sleep apnea did no more than minimally affect plaintiff's ability to work was adequately supported, and the ALJ did not err in concluding that this disorder did not constitute a "severe impairment" within the meaning of the relevant regulations.

b. fibromyalgia

In concluding that fibromyalgia did not constitute a severe impairment, the ALJ effectively dismissed that diagnosis, which was reached by both Dr. Linster and Dr. Irvine. The ALJ asserted that, though these treating physicians had diagnosed fibromyalgia, "neither of them reported findings in support of the diagnosis." He added that, though the doctors had prescribed medications for plaintiff's "subjective complaints of fibromyalgia pain," given the "absence of corroborating findings, claimant's complaints alone are insufficient to conclude fibromyalgia has been a severe impairment."

These assertions are not supported by the medical record. Dr. Linster reported that plaintiff's fibromyalgia diagnosis met the American Rheumatological criteria. In addition, he reported a positive Anti-Nuclear Antibody (ANA) test result that was indicative of an autoimmune disorder. Plaintiff correctly notes that fibromyalgia is diagnosed "purely on clinical grounds based on the doctor's history and physical examination," and that for individuals with "widespread body pain, the diagnosis of fibromyalgia can be made by identifying point tenderness areas . . . by finding no accompanying tissue swelling or inflammation, and by excluding other medical conditions that can mimic fibromyalgia." http://www.medicinenet.com/fibromyalgia/page3.htm. Plaintiff's fibromyalgia diagnosis was based upon these accepted diagnostic techniques, and the conclusion that the symptoms caused by plaintiff's fibromalgia did not have more than a "minimal effect" on plaintiff's ability to work is not supported by the record. Accordingly, the ALJ erred in finding that plaintiff's fibromyalgia was not a "severe" impairment.

2. Rejection of opinions of Drs. Lister and Irvine

Because treating physicians have a greater opportunity to know and observe their

patients, their opinions are given greater weight than the opinions of other physicians.

Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  Accordingly, an ALJ must

support the rejection of a treating physician's opinion with "findings setting forth specific and

legitimate reasons for doing so that are based on substantial evidence in the record."

Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  Rejection of a treating physician's

uncontroverted opinion must be supported by clear and convincing reasons.  Lester v. Chater,

81 F.3d 821, 830-31 (9th Cir. 1995).

As noted above, Drs. Linster and Irvine, who were treating physicians, opined that

plaintiff's various impairments caused symptoms that markedly reduced his ability to perform

work activities.  Dr. Linster opined that plaintiff would need to lie down and rest

intermittently during an 8-hour work day, would need to alternate standing and sitting to

accommodate and relieve pain, and would need to elevate his legs intermittently.  He

indicated that plaintiff would have difficulty concentrating and maintaining attention

continuously for two hours, would have difficulty performing manipulative functions at

work, and would likely miss work more than 24 days per year because of his symptoms.

Though he opined that plaintiff was not disabled "based upon objective medical findings,"

Dr. Linster opined that plaintiff was not a malingerer, and concluded that plaintiff had been

disabled since October, 1995.

In May, 1999, Dr. Irvine likewise indicated that plaintiff was unable to work.  In a

questionnaire dated November 7, 2001, Dr. Irvine further indicated that plaintiff could not

perform even "low stress" work, had significant exertional limitations, and would likely miss

work more than four days per month because of his impairments.

The ALJ rejected the opinions of these treating physicians. He concluded that

Dr. Linster's opinions about plaintiff's need to lie down, take frequent breaks, and alternate

between sitting and standing, and Dr. Linster's opinion that plaintiff would be absent from

work frequently, were not reliable "because they are not supported by findings on

examination or the use of medically acceptable diagnostic techniques." The ALJ noted that

Dr. Linster had indicated that plaintiff was not disabled "based upon objective medical

findings," and stated that Dr. Linster's opinions based upon plaintiff's "mental impairments or

limitations" were "beyond his expertise." He also found Dr. Linster's opinion unconvincing

because it was not supported by "findings on examination" and that his submission of an

unsigned fibromyalgia questionnaire make it uncertain as to whether he had completed the

form.

The ALJ opined that Dr. Irvine's statement that plaintiff could not work "at this time"

in May, 1999, suggested that this limitation was temporary, and found that Dr. Irvine's

opinion that plaintiff could not perform even "low stress" jobs was not adequately supported

by the record. The ALJ gave no weight to Dr. Irvine's conclusion that plaintiff had

substantial exertional limitations because he found no evidence in the record that

substantiated those limitations. He took particular exception to Dr. Irvine's opinion that

plaintiff's ability to do repetitive reaching, handling, and fingering was significantly limited,

citing a complete absence of "findings in support of any condition affecting his upper

extremities." The ALJ concluded that Dr. Irvine's opinion that plaintiff would miss work

more than four times per month was not reliable because it was based upon plaintiff's

"history, which has been unreliable." He added that Dr. Irvine "mostly prescribed medications based upon plaintiff's subjective allegations," and concluded that his "entire assessment appears to be colored by advocacy of the claimant's disability, which alone is insufficient for a conclusion of disability."

Based upon a careful review of the medical record, I conclude that the ALJ did not provide legally sufficient reasons for rejecting the opinions of these treating physicians as to plaintiff's impairments and their effects on his residual functional capacity. As noted above, though the ALJ did not expressly reject the fibromalgia diagnosis, he effectively dismissed that diagnosis and the associated symptoms on the basis that the diagnosis was not supported by objective medical findings. However, the diagnosis was made according to accepted criteria, and the ALJ has cited no specific and legitimate bases for discounting the diagnosis. In the absence of a sufficient basis for rejecting the fibromyalgia diagnosis, the ALJ provided no legitimate basis for rejecting plaintiff's treating physicians' conclusion that plaintiff's fibromyalgia produces significant symptoms that limit plaintiff's ability to engage in work-related activities.

Plaintiff's somatization disorder will be discussed in the analysis of the ALJ's evaluation of Dr. Greenough's opinion below. Here, it is sufficient to note that, though he cited somatoform disorder as one of plaintiff's severe impairments, the ALJ based his rejection of the opinion of plaintiff's treating physicians in substantial part on his observation that plaintiff's symptoms seemed to be "out of proportion to objective findings" and his concern about "the absence of confirmation of particular diagnoses or etiology to account for some of his complaints . . . ." However, the absence of objective findings or "particular diagnoses or etiology" to account for an individual's complaints is inherent in the very nature

of a somatoform disorder.  Those suffering from a somatoform disorder experience physical

symptoms for which there are no demonstrable organic findings, and which are presumed to

be linked to psychological factors.  See Stedman's Medical Dictionary, 510 (26th ed. 1995).

The ALJ could not reasonably expect that plaintiff's allegations of physical limitations and

pain would be confined to causes concretely identified by objective physical examination and

findings, because those with a somatoform disorder experience symptoms that are

psychologically enhanced.

The ALJ's rejection of the opinions of plaintiff's treating physicians concerning the

severity of plaintiff's impairments and their effect on his residual function capacity was based

largely on his effective rejection of the fibromyalgia diagnosis and upon his concern that

plaintiff's symptoms were not fully supported by objective medical findings, despite a well

documented diagnosis of somatoform disorder.  Given plaintiff's fibromyalgia diagnosis and

somatoform disorder diagnosis, Dr. Linster's and Dr. Irvine's conclusions that plaintiff was

significantly impaired was fully supported by the medical record, and the ALJ did not provide

sufficient reasons for rejecting their conclusions about his limitations.  Additionally, I note

that, if the ALJ had serious questions about whether Dr. Linster had filled out the unsigned

fibromyalgia questionnaire, he could have easily clarified that issue by contacting that

treating physician.  Likewise, if he thought that Dr. Irvine's indication that plaintiff was

unable to work at a particular time may have suggested that this treating physician thought his

impairment was temporary, he could have asked this treating physician for further

clarification.  The ALJ's conclusion that Dr. Linster's opinions as to plaintiff's mental

impairments were beyond his expertise is inconsistent with the Ninth Circuit Court of

Appeals' observation that physicians in general practices routinely identify and treat

psychiatric disorders. See Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987). His assumption that Dr. Irvine's assessment was "colored by advocacy" is not supported by a careful review of the medical record, and his assertion that there was a "complete absence" of support in the record for Dr. Irvine's opinion concerning limitations in plaintiff's ability to use his hands is incorrect. As noted above, Randy Miller, a physical therapist, found that plaintiff was limited to occasional reaching, grasping, and use of hand controls.

When an ALJ provides inadequate reasons for rejecting the opinion of a treating or examining physician, that opinion is credited as a matter of law. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). A reviewing court then has discretion to remand the action for further proceedings or for a finding of disability and an award of benefits. See, e.g, Stone v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985). Whether an action is remanded for an award of benefits or for further proceedings depends on the likely utility of additional proceedings. Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000). A reviewing court should credit the evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited. Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

Here, the ALJ did not provide legally adequate reasons for rejecting the opinions of plaintiff's treating physicians. There are no outstanding issues to be resolved before a determination of disability can be made, and it is clear that if the opinions of these doctors had been credited, a finding of disability would be required. Under these circumstances, the

action should be remanded for a determination of the date upon which plaintiff became disabled, and an award of benefits.[3]

3. Rejection of Dr. Greenough's opinions concerning effects of somatoform disorder

My conclusion that the action should be remanded for an award of benefits based upon the ALJ's failure to adequately support his rejection of the opinions of plaintiff's treating physicians makes it unnecessary to reach the remainder of plaintiff's arguments. Nevertheless, in order to create a full record for review, I will briefly address the remainder of the issues plaintiff has raised.

The ALJ rejected Dr. Greenough's assertion that "plaintiff's perception of himself as physically disabled is sufficient to lend a reality to that perception" and concluded that he sufficiently accounted for the somatoform disorder that  Dr. Greenough diagnosed by limiting plaintiff to simple, routine, repetitive work.

Dr Greenough was an examining psychologist.  An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinions of an examining physician, Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990), and must provide specific and legitimate reasons that are supported by substantial evidence in the record for rejecting an examining physician's opinion that is contradicted by another physician.  Andres v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).

_____

[3]On remand, the agency will still need to determine whether plaintiff was disabled before June 30, 1994, which the ALJ cited as plaintiff's date last insured.  As noted above, Dr. Linster stated that plaintiff had been unable to work since October, 1995.

FINDINGS AND RECOMMENDATION - 27

Plaintiff contends that the ALJ erred in assuming that restricting him to simple, repetitive work sufficiently accounted for the limitations imposed by his somatoform disorder, and in rejecting Dr. Greenough's conclusion as to the effect of plaintiff's self perception. I agree. The Commissioner has cited no authority for the proposition that the effects of a somatoform disorder are necessarily offset by a limitation to simple, routine, repetitive work. A somatoform disorder causes an individual to believe that his physical ailments "are more serious than the clinical data would suggest." Easter v. Bowen, 867 F.2d 1128, 1129 (1989). There is no support for the conclusion that this perception is lessened if the individual is restricted to simple, routine, repetitive work, or that the effect of this perception does not affect the ability to perform such work. There is likewise no support for the ALJ's conclusion that Dr. Greenough erred in concluding that plaintiff's perception of himself as physically disabled "is sufficient to lend a reality to that perception." Instead, this observation is consistent with the nature of a somatoform disorder.

4. Rejection of evidence from lay witness

The earlier order of the district court remanding this action to the agency required the ALJ to consider and discuss the lay witness testimony of Robert Van Siereveld and Benney Lee Paris, Jr. Van Siereveld, a friend, testified that plaintiff had difficulty walking and complained of hand and arm numbness. Paris, a former coworker, testified that plaintiff could not work an eight-hour day as a volunteer van driver, and could not work at all on his bad days.

The ALJ found that, though this testimony "could be considered generally credible to the extent that it reflects [the individuals'] observations of the claimant's pain behavior or

repetitions of his complaints," it was not helpful because there were "no findings" about plaintiff's hands and arm, and because there was "no reason to conclude he would be unable to complete an eight-hour day, or need to be absent from work more than one day a month because of his impairments."

An ALJ must provide reasons that are germane for discounting the testimony of a lay witness. E.g., Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).

Plaintiff contends that the ALJ failed to provide adequate reasons for discounting the lay witness testimony of Van Siereveld and Paris, Jr.  I agree.  As noted above, a physical therapist found that plaintiff had limitations in his extremities that were consistent with the testimony of Van Siereveld, and the conclusion that plaintiff would miss more than one day a month and could not complete an eight-hour work day was supported by the opinions of a physical therapist and Drs. Linster and Irvine, plaintiff's treating physicians.


5. ALJ's RFC Assessment

The ALJ found that plaintiff retained the functional capacity required to perform "light" work, with "proximity to restrooms," limited by a restriction to no more than two hours of standing and walking in an eight-hour work day, and restricted to simple, routine, repetitive work with only occasional public contact.

Plaintiff contends that this RFC was legally insufficient because it failed to account for the limitations assessed by Drs. Greenough, Irvine, and Linster, discussed above, failed to account for the limitations assessed by Dr. Lyons, and failed to account for the effects of plaintiff's fibromyalgia and somatoform disorder.

As to Drs. Greenough, Irvine, and Linster, and as to the effects of plaintiff's fibromyalgia and somatoform disorder, I agree for the reasons set out above. I also agree that the ALJ's residual functional capacity assessment failed to either properly reject or account for the "moderate limitations in interacting appropriately with supervisors and responding appropriately to work pressures" assessed by Dr. Lyons. The ALJ dismissed this assessment on the grounds that Dr. Lyons saw plaintiff only one time "and based his assessment on the claimant's history." A careful reading of Dr. Lyons' assessment, however, supports the conclusion that Dr. Lyons' opinion was based upon results of substantial objective testing.

6. ALJ's conclusion that plaintiff could perform "other work"

In order to be accurate, an ALJ's hypothetical to a VE must set out all of the claimant's impairments and limitations. E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (citing Baugus v. Secretary of Health and Human Services, 717 F.2d 443, 447 (8th Cir. 1983)). The ALJ's depiction of the claimant's limitations must be "accurate, detailed, and supported by the medical record." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). If the assumptions in the hypothetical are not supported by the record, a VE's opinion that a claimant can work does not have evidentiary value. Gallant, 753 F.3d at 1456.

Plaintiff contends that the ALJ's hypothetical to the VE describing his residual functional capacity was deficient because it was based upon an inaccurate assessment of his residual functional capacity. For the reasons set out above, I agree.

### Conclusion

A judgment should be entered REVERSING the Commissioner's decision, and

REMANDING this action to the agency for a determination that plaintiff is disabled,

determination of the date upon which plaintiff became disabled, and an award of benefits.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge.  Objections,

if any, are due January 4, 2010.  If no objections are filed, then the Findings and

Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the

Findings and Recommendation will go under advisement.

DATED this 15th day of December, 2009.

_____

John Jelderks

U.S. Magistrate Judge